829 So.2d 1066 (2002)
PRIORITY E.M.S.
v.
CRESCENT CITY E.M.S. d/b/a Medic One and Medic One, Inc.
No. 2001-CA-2171.
Court of Appeal of Louisiana, Fourth Circuit.
October 16, 2002.
Rehearing Denied November 15, 2002.
*1068 W. Patrick Klotz, Klotz & Early, New Orleans, LA, Counsel for Plaintiff/Appellant.
Leonard L. Levenson, and C. Ellis Henican, Jr., New Orleans, LA, Counsel for Defendant/Appellee.
(Court Composed of Chief Judge WILLIAM H. BYRNES III, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
Judge MAX N. TOBIAS, JR.
Priority E.M.S., Inc. ("Priority"), Michael Boatright, and Jan Boatright (collectively referred to as "appellants") appeal trial court judgments rendered on 5 December 1996, 9 July 1998, and 16 February 2001, all in favor of Safeway Financial Services, Inc. ("Safeway") on its reconventional demand. The judgment of 5 December 1996 awarded Safeway damages following a trial at which the trial court found the appellants liable for fraud and breach of contract in the confection of a loan agreement. The 9 July 1998 judgment granted the appellants a new trial on the issue of quantum only. The 16 February 2001 judgment, rendered following the second trial on quantum, awarded Safeway damages of $429,558.00 and $10,000.00 in attorneys fees on its reconventional demand. Safeway has answered the appeal.

FACTUAL AND PROCEDURAL HISTORY
In January 1988, Michael Boatright, a trained emergency medical technician, executed articles of incorporation forming Priority, a corporation that would provide emergency ambulance transportation services to hospitals, nursing homes, and other health care facilities. The initial report required by La. R.S. 12:101 filed with the Louisiana Secretary of State's office named Michael Boatright and his wife, Jan, as first directors and Donald Heyd ("Heyd") as the registered agent for service of process. Michael Boatright initially sought financing for the business venture from a local bank and another source, but was unsuccessful. Shortly thereafter, still seeking capital, Michael Boatright answered a newspaper advertisement placed by Safeway and its owner, Joseph Young, Jr. ("Young"), who was interested in providing capital for a business venture.
Michael Boatright met with Young and informed him that he had recently formed the corporation, but had not held an organizational meeting nor issued stock certificates. After further negotiations, the parties met on 10 March 1988.[1] At some *1069 point, the parties executed written agreements dated 10 March 1988, which provided that Safeway would lend Priority money with interest at 18% per annum as capital to fund the new business venture. The agreements further provided that Priority would employ Michael Boatright and Heyd for a period of ten years. As compensation for their services, Michael Boatright would receive 28 shares of company stock and Heyd would receive 12 shares. The written agreements, which Michael Boatright and Heyd signed, specifically stated that these shares represented 28% and 12% of the corporation, respectively. In return for its investment, Safeway and its nominee, Alacrity, Inc. ("Alacrity"), each received 30 shares of the company's stock. Young believed these 60 shares represented 60% of the company. As per the agreements, stock certificates for 100 shares were issued as follows: Michael Boatright received Certificate No. 1 for 28 shares; Heyd received Certificate No. 2 for 12 shares; Safeway received Certificate No. 3 for 30 shares; and, Alacrity received Certificate No. 4 for 30 shares. Michael Boatright and Llambias signed each stock certificate as president and secretary of Priority, respectively.
Between 10 March 1988 and 7 October 1988, Safeway loaned Priority a total of $375,468.20 for operating expenses. Each loan was secured by an 18% interest bearing promissory note made out to "bearer" and signed by Michael Boatright, individually, and in his capacity as president of Priority. From the 13 January 1989 to 23 March 1990, Priority made a total of 51 payments to either Young or Safeway totaling $123,000.00. Michael Boatright contended that the 51 payments were to satisfy Priority's debt to Safeway. Young, however, claimed that some of the payments constituted compensation for his services to the company. In any event, by early 1990, the Boatrights had become very dissatisfied with Young's participation in the day-to-day operations of the company.
Unbeknownst to Young, on 27 March 1990, Priority's Board of Directors held a meeting for the election of corporate officers; Jan and Michael Boatright, the only directors, were present. At the meeting, Michael Boatright was elected president of Priority and Jan Boatright was elected secretary-treasurer. The directors also voted to change the authorized signatures on the corporation's bank accounts, allowing only the president and secretary-treasurer to sign checks, drafts, or orders for the withdrawal of funds from corporate accounts. The directors also accepted the resignation of Heyd as the corporation's agent for service of process and appointed Louis R. Koerner, Jr. ("Koerner"), an attorney-at-law, to replace him.
The following day, on 28 March 1990, Heyd and Michael Boatright executed a stock transfer agreement wherein Heyd transferred 12,000 shares of Priority common stock to Michael Boatright. That same day, Koerner, in his capacity as attorney for Priority and the Boatrights, sent a letter to Young informing him that his shares of Priority stock constituted less than one percent of the total 1,000,000 authorized shares and less than one percent of the 400,000 shares issued to Mr. and Ms. Boatright. The letter also requested that Young cease representing himself as a Priority corporate officer and engaging in corporate business activities.
After receiving Koerner's letter, on 5 April 1990, Young, on behalf of Priority, Safeway, and Alacrity, filed a joint petition titled, "Derivative Action and Writ of Injunction and Quo Warranto," in the Twenty-Fourth Judicial District Court in Jefferson Parish, naming Michael and Jan Boatright as defendants. The petition alleged that Michael Boatright, as president and general manager and as a minority *1070 stockholder of the company, usurped his authority and performed many acts detrimental to the corporation, including unlawfully obtaining exclusive control of the corporation's bank account and disbursing its funds. In addition to injunctive relief, the petition prayed that Safeway and Alacrity be recognized as Priority's majority shareholders; Young be recognized as President with exclusive authority to sign checks; and, Young, Seal, and Teva Ward be recognized as directors.
In response, the Boatrights raised dilatory and peremptory exceptions and also filed an answer, reconventional, and third party demands. In their answer, the Boatrights denied that Safeway and Alacrity were majority shareholders of Priority because 1,000,000 shares of Priority stock had been authorized. They also asserted that on 29 January 1988, 428,000 shares of Priority stock had been issued as follows: Jan and Michael Boatright150,000 shares each; Aaron and Kristen Boatright 50,000 shares each; Heyd12,000 shares; Ryan Heyd3,000 shares; Carlos Alas 10,000 shares; Chris Oetjens1,000 shares; Michael Brown1,000 shares; and, Angelina Brown1,000 shares.
Following a trial on 18 April 1990, the parties entered into a settlement, which was read into the record. The Boatrights agreed to pay Safeway by 15 May 1990 the balance due on the promissory notes as of 16 April 1990 ($375,925.01) plus 18% interest and $7,000.00 for attorney fees and costs. In return, Safeway and Alacrity would transfer their 60 shares of Priority stock to the corporation and the quo warranto suit would be dismissed.
On 14 May 1990, Young sent a letter to Priority, informing the Boatrights that the total amount due Safeway on 15 May 1990 was $389,929.41 in addition to $3,500.00 for attorney fees. After the Boatrights failed to satisfy their obligation under the settlement agreement, Safeway and Alacrity retained attorney, John A. Mmahat ("Mmahat"), to pursue legal action. Mmahat sent a letter to both the trial judge and Koerner advising them that the Boatrights had defaulted on their obligation and, thus, the settlement agreement of 18 April 1990 was void. After further negotiations, on 31 May 1990, the parties executed an "Act of Transfer of Interest," whereby Priority paid $402,500.00 to Young, Safeway, and Alacrity in consideration of Safeway and Alacrity transferring their 60 shares of stock and all other interest in the company to Priority.[2] In addition, on 7 June 1990, the parties also filed a "Joint Motion to Dismiss" in the trial court agreeing to dismiss the quo warranto suit, including the reconventional and third party demands, with prejudice. The trial judge granted the motion on 11 June 1990.
Subsequent to the dismissal of the quo warranto suit, Young went to work for Crescent City E.M.S. d/b/a Medic One, Inc. ("Medic One"), Priority's main competitor. Believing Young was jeopardizing Priority's relationship with its clients, the Boatrights, on behalf of Priority, filed suit against Medic One on 8 October 1990 in Civil District Court for the Parish of Orleans. Priority later filed a supplemental petition, naming Young and others, as defendants, alleging inter alia that Young had engaged in unfair trade practices. Young answered the petition and filed a reconventional demand, alleging fraud in the confection of the 1988 loan transaction and breach of contract. Safeway and *1071 Alacrity were later joined as plaintiffs-in-reconvention.
Meanwhile, on 29 January 1991, Koerner, on behalf of the Boatrights, filed a rule to show cause in the quo warranto suit in the Twenty-Fourth Judicial District Court, ordering Young, Safeway, and Alacrity to show cause why the court should not enter judgment requiring them to execute a broadly worded mutual release and indemnity agreement which released the Boatrights and Priority from all claims alleged in the quo warranto suit as well as any contractual and delictual claims arising on or prior to 18 April 1990, including securities fraud. Following a hearing on the rule to show cause on 20 February 1991, the trial court denied the Boatrights relief, holding that no further action was warranted because the quo warranto suit had been dismissed. Thereafter, on 26 February 1991, Koerner filed a petition to annul the 11 June 1990 judgment that dismissed the quo warranto suit. No action was taken on that petition.
In response to Young, Safeway, and Alacrity's reconventional demand, Priority and the Boatrights filed exceptions of prescription, no cause of action, no right of action, venue, jurisdiction, vagueness, and res judicata. On 10 August 1992, the trial court rendered judgment overruling the exceptions of prescription, venue, jurisdiction, and vagueness, and referred the exceptions of no right of action, no cause of action, and res judicata to the trial on the merits.
A trial on Safeway's, Alacrity's, and Young's reconventional demand was held on 6, 13, and 14 May 1996.[3] However, prior to the commencement of trial, the trial court denied Priority's and the Boatrights' exception of res judicata, concluding that the earlier quo warranto suit did not involve allegations of fraud and breach of contract. On 5 December 1996, Judge Louis DiRosa rendered a judgment in favor of Safeway, and against Priority and the Boatrights, in the sum of $413,000.00, plus $41,300.00 in attorney fees, interest, and costs. Safeway recorded the judgment in the mortgage records of Orleans Parish pursuant to La. C.C.P. art. 2252. Priority and the Boatrights filed a motion for reconsideration, which the trial court denied on 31 January 1997. Simultaneously, they filed an application for supervisory writs to this court, seeking to reverse the 5 December 1996 money judgment. In an unpublished opinion, this court denied the writ application (No. 96-2747), holding that Priority and the Boatrights had to take either a suspensive or devolutive appeal.[4]
*1072 In the meantime, while appeal No. 96-1367 and writ No. 96-2747 were pending before this Court, on the ex parte motion of Priority and the Boatrights, the trial court revoked the signing of the 5 December 1996 judgment on 4 February 1997, leaving it in the purported status of a rendered but unsigned judgment under La. C.C.P. art.1911, effectively staying execution of the judgment. On 16 April 1997, the trial court denied Safeway's motion to set aside the previously ordered stay pending the outcome of writ No. 96-2747.
Priority and the Boatrights filed a second motion for reconsideration requesting a new trial and that the original money judgment be cancelled from the mortgage records. On 9 July 1998, in response to that motion, the trial court rendered a judgment denying the request for cancellation of the earlier judgment from the mortgage records, and denied a new trial on the merits; the trial court granted a new trial on the issue of quantum only, stating:
Insofar as the amount of damages awarded, this Court has done the most in-depth searching. I have reviewed my entire reasons of the conflicting testimony in this matter and sincerely feel that the damages awarded may be out of proportion to the harm suffered. For this reason this court feels justified in granting a new trial to Priority and the Boatrights on the matter of quantum only.
Priority and the Boatrights then appealed to this Court both the judgment of 5 December 1996 and the judgment of 9 July 1998. This court dismissed the appeal finding that neither judgment was a final appealable judgment.[5]
The new trial on the quantum issue was held on 23 and 24 October 2000 before Judge Ethel Simms Julien. Following the trial on the merits, Judge Julien rendered judgment on 16 February 2001 awarding Safeway $429,558.00 in damages plus $10,000.00 in attorneys fees and costs.
In finding Priority and the Boatrights liable to Safeway for fraud and breach of contract following the first trial, Judge DiRosa stated in his reasons for judgment:
This matter consists of a suit and counter suit for damages for fraud, for breach of contract, for breach of Blue Sky Laws and for a myriad of claims and counter claims, all of which resulted in this litigation.
Basically, Safeway Financial Services Inc. (and its designee Alacrity Inc.) (herein after referred to as Safeway) through Joe Young, its president, loaned Priority E.M.S. (Priority) enough money, approximately $400,000.00, to make the business a going concern. Safeway understood they were to receive Sixty Per Cent (60%) ownership of the stock in the business and to that end entered into a written agreement to operate the business in the hope of future success, which, ultimately was achieved.
At some time thereafter, Mr. and Mrs. Boatright (Boatrights) became dissatisfied with Safeway and Joe Young, its president, and began issuing giant sums of the company's unissued stock to themselves and their friends. As a result of these issuances, the Sixty Per cent (60%) share of the business owned by Safeway was diminished to the point where Safeway's ownership was an insignificant, infinitesimal amount.
A quo warranto lawsuit resulted in Jefferson parish between the parties, *1073 which lawsuit was settled for just about the return of the original money loaned by Safeway. This suit resulted from that confrontation, hence the allegations of fraud, damages, etc.
In the settlement proceedings in Jefferson, Safeway returned their stock to Priority even though it then represented less than One Per Cent (1%) of the total shares issued.
In these proceedings this court entertained many exceptions, pretrials, arguments and preliminary matters prior to setting the main demand for trial. The main demand consisted of all the various claims of prescription, Blue Sky Laws, etc., previously referred to herein. The case went to trial with many of these issues unsettled.
Priority and the Boatrights contend that all claims were settled in the Jefferson Parish quo warranto suit, while Joe Young and Safeway state that that suit settled only what was stated therein, not the fraud and breach of contract aspects of the transactions.
If the suit in Jefferson had been filed subsequent to January 1, 1991, the effective date of the C.C.P. Art. 1061 amendment, Priority's contention would be valid. [h]owever this matter was filed prior to that amendment; Transfer of the stock in the quo warranto suit may have satisfied the violations of the Blue Sky laws but this court feels that this lawsuit is subject to the fraud and breach of contract contentions of Safeway and not to the compromise and res judicata allegations of the Boatrights.
From the facts ascertained at trial, there is no mistaking the original intention of the parties. It was for Safeway to loan the money on Boatrights (sic) idea, but for Sixty Per Cent (60%) of the stock of the company, not only before, but after any success.
No doubt the extended trial of this case is full of unnecessary testimony which the court wishes it had curtailed. It was, in a word, verbose.
Two things, however, stand out in the court's recollections and notes of the trial. The first is that Mr. Boatright had little regard for the truth, his testimony borders on an insult to one's intelligence. The second is that there was specific intent by the Boatrights to squeeze out of the business the very people who were responsible for its existence. Perhaps they felt justified by their considering the Safeway contract onerous; but Mr. Boatright being portrayed as naïve, abused and disadvantaged "choir boy" is ludicrous.
Considering the above, the case, in this court's opinion, is a simple case of fraud and breach of contract both done with the intention of wresting control of the business from Safeway. Despite Boatrights' feeling of justification, the only thing remaining is this court's opinion is the measure of damages that should be awarded to Safeway.
The court likewise feels compelled to recognized that since "settlement" of the quo warranto suit the business has been successfully operated and expanded through the efforts of the Boatrights to a point where each Boatright can draw a personal salary of $50,000.00 per year. The court is not impressed with their testimony that the business is in dire straits. The assets alone seem to prove otherwise.
For these reasons, the court feels that because of the Boatrights' efforts, if (sic) would be equally unfair to return the business ownership to Safeway and therefore feels that damages in money are in order with the intention of fairly compensating Safeway for its loss.

*1074 ASSIGNMENTS OF ERROR
The first assignment of error to be addressed is whether the trial court erred in denying appellants' exception of res judicata.[6] Specifically, appellants contend that the May 1990 settlement (Act of Transfer of Interest signed and dated by the parties on 31 May 1990) in the quo warranto suit in the Twenty-Fourth Judicial District Court and the 11 June 1990 judgment, which granted the joint motion to dismiss the suit with prejudice, bar any claims that Safeway, Young, and Alacrity may have against them arising from the confection of the stock agreements. They contend that Priority's paying Safeway's promissory notes, interest, attorney fees, and construction costs in accord with the settlement agreement effectively extinguished or compromised any claims Safeway and Alacrity may have had against them for fraud and breach of contract. We disagree.
Young, Safeway, and Alacrity filed the petition in the quo warranto suit in April 1990. Thus, the preclusive effect of the first lawsuit is governed by pre-revision res judicata law.[7]See Ortego v. State, DOTD, 96-1322 p. 6 (La.2/25/97), 689 So.2d 1358, 1362.
Prior to the 1990 amendments, La. R.S. 13:4231 provided:
The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must between the same parties, and formed by them against each other in the same quality.
Thus, in order for res judicata to apply, the thing demanded in the second action must be the same as the thing demanded in the first action which had been concluded by a definitive judgment; the demand must be founded on the same cause of action; and the demand must be between the same parties, formed by them against each other in the same quality. Rivet v. First Financial Bank, FSB, 538 So.2d 216, 220 (La.1989).
The thing demanded by Young, Safeway, and Alacrity in the quo warranto suit was a determination of the ownership of Priority stock and the removal of Michael and Jan Boatright as the respective president and secretary-treasurer of Priority. In their reconventional demand filed in the second suit, Young, Safeway, and Alacrity sought damages for fraud and breach of contract. Clearly, the demands in the quo warranto suit and the reconventional demand were not the same. Furthermore, neither the 31 May 1990 Act of Transfer of Interest nor the 11 June 1990 judgment contained a broad release of any and all claims Young, Safeway, and Alacrity may have had against the Boatrights and Priority. In fact, the record discloses *1075 that Koerner wanted to include a broad release of claims by Young, Safeway, and Alacrity in the Act of Transfer of Interest, but they refused to agree to any such term. Also, as noted above, in February 1991, the trial judge in the quo warranto suit denied Priority and the Boatrights relief when they filed a rule to show cause why the court should not have Young, Safeway, and Alacrity execute broadly worded mutual release and indemnity agreements. In view of these facts, we do not find that the trial judge erred in concluding that Safeway's claims for fraud and breach of contract were not barred by res judicata.
In the first assignment of error listed in their original brief, appellants argue that the trial court erred as a matter of law by not finding that Safeway's federal securities law claims had prescribed. In reconvening, Young, Safeway, and Alacrity alleged that the Boatrights violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77 I (2) (1982).[8] Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m (1982), supplies the applicable statute of limitations for section 12(2) claims.[9]
It is clear from the reasons for judgment that the trial court considered Safeway's fraud and breach of contract claims only. Because the trial court failed to render a judgment based on the federal securities act claim, we find no merit to this assignment of error.
In their second assignment of error, appellants contend that the trial court erred by failing to conclude that Safeway's claims pursuant to Louisiana's Securities Law, La. R.S. 51:702 et. seq. had prescribed. Specifically, La. R.S. 51:714(C)(1)(a) provides a two-year prescriptive period for bringing claims for violations of state securities law pursuant to La. R.S. 51:712.
Again, the reasons for judgment make clear that the trial court did not render judgment based on violations of Louisiana Securities Law. Thus, this assignment of error is without merit.
Appellants' third assignment of error asserts that the trial court erred in awarding Safeway compensatory damages where the Louisiana jurisprudence and Louisiana Civil Code articles relating to fraud provide only for the party to be restored to the situation that existed prior to the contract and for attorney fees. Specifically, appellants contend that the trial court found their liability arose from the Boatrights' misrepresentation in the initial agreement of 10 March 1988 that Safeway and Alacrity, together, were to receive 60 shares of Priority stock, amounting to 60% ownership in the company. They claim the trial court found no liability based on *1076 the performance of the contract. In other words, the fraud occurred in the confection of the contract, not in the performance. Thus, appellants contend, attorneys fees only and not compensatory damages are available under La. C.C. art.1958, citing Ratcliff v. Boydell, 93-0362, 92-0630 (La. App. 4 Cir. 4/3/96), 674 So.2d 272.
La. C.C. art.1994, relating to liability for an obligor's failure to perform, provides:
An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance.
Regarding damages for an obligor's failure to perform, La. C.C. art.1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." In the case of a bad faith obligor, La. C.C. art.1997 provides that "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."
La. C.C. art.1958, the civil code article specifically governing damages for fraud, provides that "[t]he party against whom rescission is granted because of fraud is liable for damages and attorney fees." The official revision comment to article 1958 indicates that the article is referring to fraud in the confection of the contract, not in the performance, and the general provisions on damages govern recovery under the article.
Ratcliff, supra, involved a dispute between the plaintiff, a former client of, and the attorneys who represented her in the prosecution and settlement of a wrongful death claim. At issue was the amount due the attorneys under a contingent fee contract for a "structured settlement" plaintiff made with the tortfeasor. The attorney defendants failed to return the disputed amount of $25,214.00 to the plaintiff and contested her claim. The trial judge awarded the client a full refund of the contested amount in addition to $131,000.00 for damages for abuse of process, fraud, conversion, unethical practices, attorney fees, and sanctions. Whether attorney fees were available under La. C.C. art.1958 was an issue, among many, raised on appeal. This court, on appeal, noted the revision comment to article 1958 that the article referred to fraud in the confection of the contract, not in performance. Notwithstanding the comment, however, this court found fraud not in the confection of the contingent fee contract, but rather in its performance, i.e., which was supposed to involve the attorneys' taking the correct fee and disbursing to the plaintiff/client the amount due her. Thus, this court concluded that La. C.C. art.1997, which contains no provision for attorney fees, was the applicable statute. In reversing the award of attorney fees, this court stated:
In Louisiana, attorneys' fees have never been considered to be compensatory damages. The general rule has always prevailed that the right to recover attorney fees must be expressed by a statute or a contract. In the present case, there is neither and this award of attorney fees was erroneous.
Id. at p. 17, 674 So.2d at 282.
Appellants' incorrectly interpreted this court's holding in Ratcliff, supra, and their reliance on it is misplaced. In the instant case, Judge DiRosa specifically found that the Boatrights had committed fraud and breach of contract with the intention of wresting control of Priority from Safeway. He found that the original intent of the parties was for Safeway to loan the money on the Boatrights' idea, but for 60% of the stock of the company, not only before, but after any success. Although the Boatrights asserted in their answer to *1077 Safeway's reconventional demand that the 428,000 shares of stock had been issued in January 1988 before their agreement with Young, Safeway, and Alacrity, Judge DiRosa specifically found that the Boatrights began issuing giant sums of Priority's unissued stock to themselves and their friends after they became dissatisfied with Young and Safeway. Clearly, the trial judge concluded that the fraud occurred in the performance of the contract. After reviewing the testimony and evidence in the record, we cannot say this finding is manifestly erroneous. Hence, La. C.C. art.1997 is applicable. Although attorney fees are not provided for in article 1997, the appellants do not assign as error the trial court's award of the attorney fees. Thus, we cannot amend the judgment to exclude the attorney fees.
Within the third assignment of error, appellants contend that the trial court erred in finding a breach of contract in the absence of a written contract between Safeway and Priority to the effect that Priority would issue Safeway and Alacrity a total of 60 shares of stock representing 60% of the company, citing La. C.C. art. 1831, which provides:
A party who demands performance of an obligation must prove the existence of the obligation.
A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction.
Although no written agreement specifically stated that Safeway and Alacrity's 60 shares of Priority stock represented 60% of the company, the evidence Safeway put forth at trial clearly supports the trial court's finding that such an agreement existed. The March 1988 employment stock agreements entered into by Michael Boatright and Heyd with Priority stated that their respective shares, 28 and 12, represented 28% and 12% of the company's stock or a total of 40% of the company. The trial court inferred from these agreements, in addition to the issued stock certificates, that Safeway and Alacrity's combined 60 shares represented the remaining 60% of the company's stock. Also, the trial court found Young's testimony that the agreement existed to be credible.
Appellants' sixth and seventh assignments of error contest the amount of damages awarded to Safeway as excessive and not supported by the evidence. In answering the appeal, Safeway contends that the trial court's award for damages should be increased.
In the sixth assignment of error, appellants contend that the trial court's award of damages based on Priority's value in 1990 is contrary to the expert testimony presented at trial regarding the market value of ambulance companies. Specifically, appellants contend that the trial court erred in relying on Safeway's expert, George L. Long, III, a certified public accountant and an accredited business evaluator with the accounting firm of LaPorte, Sehrt, Romig & Hand. The appellants argue in their seventh assignment of error that the trial erred in not subtracting Priority's debt in using the Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") formula in determining the company's value. Safeway, however, claims that the trial judge's award for damages should be increased to $1,380,000.00 as testified to by Long.
At trial, Long testified that in analyzing Priority, he used Priority's financial statements from 1988 to 1995, income tax returns, hospital contracts, and depositions of corporate officers. He noted, however, that company documents that reflect accounts receivables, accounts payables, depreciation, and physical assets, which were *1078 necessary for an accurate valuation, were unavailable. In determining the value of the company's stock, Long utilized three approaches: the asset base approach, the market base approach, and the income base approach. Applying the asset base approach to determine Priority's value was problematic, in his opinion, because the company's financial statements were inconsistent. The financial statements did not accurately reflect the value of the company's assets and the shareholders' equity was difficult to ascertain. Although Long considered the approach, he deemed it very unreliable.
Next, Long utilized the income base approach using the company's cash flow derived from income tax statements for the years 1993, 1994, and 1995. In valuing the company's stock, he applied the EBITDA margin and deducted the company's interest bearing debt. This method valued Priority's stock as of 31 December 1995 at $2,349,911.00.
Long also explained that he used the market base approach, based on Michael Boatright's purchase of Heyd's 12,000 shares of Priority stock for $9,000.00 on 28 March 1990. Although this sale was the only sale ever of Priority stock, and ordinarily a single sale would not be a good indicator of the company's stock value, Long considered the sale an arms length transaction because both Michael Boatright and Heyd worked within the company and were familiar with its operations, assets, clients, et cetera. Long also testified that a control premium of 35% had to be applied, explaining that a share of stock is worth more if it represents control of the company as opposed to a share that does not represent any control. Because the Boatrights had obtained more than 50%, or a majority of Priority's stock, they had control of the company and their stock was considered to be more valuable. Applying the value of the shares reflected by that sale to all Priority stock, and considering a control premium of 35 % and the EBITDA margin, Long estimated the total value of the company as of 31 December 1995 was $2,357,474.00.
Finally, Long used another income base approach that valued the company's stock based on a multiple of EBITDA. He multiplied the EBITDA by 5.3 to arrive at the market value of invested capital and then deducted the interest bearing debt as of 31 December 1995 to arrive at a total value of $2,285,164.00.
Long then concluded, based on the figures arrived at, that the value of 100% of Priority stock as of 31 December 1995 was $2,300,000.00. He further concluded that the damages sustained by Safeway as a result of the Boatrights' breach of contract were $1,380,000.00 or 60% of $2,300,000.00.
Robin Nichols ("Nichols"), a certified public accountant, who was employed by Priority in 1989, also testified as an expert for Safeway. Nichols testified that he reviewed Priority's financial statements for the years 1988, 1990, 1991, and 1992. The financial statements for the year 1989 were missing. Nichols noted discrepancies in the financial statements prepared by himself and J. Thomas South ("South"), also a certified public accountant, and those prepared "in house" by Priority. He characterized the financial statements prepared "in house" as compilations rather than audits or reviews. Nichols used the 1992 financial statements to arrive at a value of Priority stock because South, who had assured their accuracy, prepared the statements. Based on the 1992 financial statements, Nichols determined that the value of Priority at the end of 1992 was more than $3,000,000.00. Thus, Safeway's damages as a result of losing 60% of its Priority stock totaled $1,800,000.00.
On the other hand, Dan Alexander ("Alexander"), a certified public accountant employed as a consultant in the emergency *1079 medical services industry, testified as an expert for Priority. Alexander testified that between November 1992 and February 1995 he worked as chief financial officer for Medical Response South Division a/k/a A.M.R. At the time, A.M.R. was acquiring other emergency medical service and ambulance companies in other parts of the country. Alexander testified that based on his knowledge no market for ambulance companies existed in 1990. He determined that as of 1990, the total value of Priority was $72,896.00. Alexander also testified that A.M.R. had considered acquiring Priority in 1993 and 1994, but did not because of its contingent liability resulting from the on-going litigation with Safeway. In his opinion, Safeway's lawsuit diminished Priority's value.
On cross-examination, Alexander acknowledged that Priority, on several occasions, had retained his services for preparing and reviewing financial statements and testifying in other Priority litigation. He also admitted that he was never given the documentation necessary to value the company. When Safeway's counsel confronted him with errors in his calculations, Alexander admitted his mistake, and recalculated his figures to arrive at a value of $132,896.00.
In rendering judgment after the second trial of the quantum issue, Judge Julien awarded Safeway $429,558.00 in damages based on Long's testimony that a company's worth can be determined by applying a multiple to the EBITDA. His testimony indicates that he deducted the company's debt when using the EBITDA formula. After reviewing the expert testimony and evidence in the record we do not find that the trial court was manifestly erroneous or clearly wrong. Although Long's and Nichols's estimates of Safeway's damages were greater than the trial court's award, these figures reflected damages as of 31 December 1995; the trial judge determined that 1990, not 1995, was the base year for determining damages. Finding no error in this conclusion, we decline to disturb the award.
Appellants argue in their eighth assignment of error that the trial court erred in allotting 60% of the value the company to Safeway where it only owned 30% of the stock. The record reflects that the trial court believed Alacrity had assigned its shares of stock to Safeway. Young testified that Alacrity was Safeway's nominee and Safeway eventually obtained Alacrity's stock. In view of this, do not find that the trial court erred in rendering judgment in favor of Safeway only.
In their ninth assignment of error, appellants argue that the trial court erred in dismissing Priority's original claims against Medic One and Young on exceptions filed by those defendants. They claim that the filings in the record in this case from 1990 through 1996 are missing and, thus, they are unable to appeal the trial court's dismissal of their original suit filed against Medic One on 8 October 1990. We find no merit to this argument.
The record in the instant appeal contains as an exhibit the record in Priority E.M.S., Inc. v. Crescent City E.M.S., Inc., d/b/a Medic One and Medic One, Inc., 98-2537 (La.App. 4 Cir. 12/23/98), 727 So.2d 1186. The exhibited record contains a copy of this court's unpublished opinion rendered in Priority E.M.S., Inc. v. Crescent City E.M.S., d/b/a Medic One and Medic One, Inc., unpub. 96-1367 (La.App. 4 Cir. 8/27/97), 698 So.2d 1078. In the unpublished opinion, we specifically reviewed and upheld the trial court's judgment of 4 March 1996, which sustained Medic One's exceptions of no cause of action and dismissed Priority's claims of tortious interference with contractual rights and unfair trade practices against Medic One and Young. Priority applied for writs to the Louisiana Supreme Court, which *1080 were denied.[10] Thus, the judgment of 4 March 1996 dismissing Priority's claims against Medic One and Young is final.
In its supplemental brief, appellants also argue that the trial court erred in rendering judgment against Jan Boatright. They claim the evidence does not support a finding of fraud or breach of contract against her. We disagree.
The record reflects that Jan Boatright was very involved in the daily operations of Priority. As a director and officer of the corporation, she took part in the issuance of the secret shares by attending and typing the minutes of the meeting at which the secret shares were issued. Ms. Boatright acknowledged that she completed forms with false information regarding ownership of the company. She was also fully aware of her husband's deceptive actions. In view of the evidence in the record, we find no error in the trial court's finding Ms. Boatright liable.
Finally, in answering the appeal, Safeway requests an increase in attorney fees. As previously stated, the trial court erroneously awarded attorney fees as La. C.C. art.1997 makes no provision for such an award. Because appellants failed to challenge the award of attorney fees we are unable to disturb the award. Thus, the award of attorney fees will be neither increased nor decreased.

CONCLUSION
Accordingly, for the reasons stated herein, the judgments of the trial court in favor of Safeway are affirmed.
AFFIRMED.
NOTES
[1] Persons present at the 10 March 1988 meeting included, Michael Boatright; Heyd; Young; Michael H. O'Keefe, Sr.("O'Keefe"), an attorney-in-fact acting as a business consultant to Young and Safeway; Melinda Seal ("Seal"), an employee of National Accounting Services, Inc., which was located in O'Keefe's Canal Street office building; Robert A. Llambias ("Llambias"), President of Safeway, who was named secretary of Priority; and, Ashley Belleau ("Belleau"), an attorney-at-law representing the Boatrights. According to Belleau's deposition, which Priority introduced into evidence at the second trial, the terms of the employment stock agreement, assignment of stock agreement, and pledge of stock agreement were negotiated at this meeting, but the parties did not sign the agreements at that time. Belleau also testified that stock certificates were not issued at the meeting, contrary to Young's testimony and O'Keefe's deposition testimony, which was also introduced into evidence at the second trial.
[2] Although the Act of Transfer of Interest provided that $402,500.00 was to be paid in cash, the record reflects that Priority paid Safeway with two checks totaling $387,000.00 and Young agreed to accept a promissory note for the remaining $15,500.00. Young acknowledged at trial that Priority paid Safeway $10,500.00, but he claimed that Priority still owed the remaining $5,000.00 on the promissory note.
[3] The trial on both the main demand and reconventional demand was originally scheduled for 26 January 1996. Medic One filed a motion to continue the trial and to severe the claims of Young and Safeway from the remainder of the litigation. The trial court granted the motion, continued the trial until May 1996, and severed Priority's claims against Medic One from Safeway's and Young's claims against Priority. Medic One also filed exceptions of no cause of action and peremption, which the trial court granted on 4 March 1996, dismissing Priority's claims of intentional interference with contractual rights and unfair trade practices against Medic One and Young. This Court, on appeal, upheld the trial court's ruling on the motion to sever and exceptions of no cause of action and preemption in an unpublished opinion in Priority E.M.S., Inc. v. Crescent City E.M.S., d/b/a Medic One and Medic One, Inc., unpub. 96-1367 (La.App.8/27/97), 698 So.2d 1078, writ denied 97-2279 (La.11/21/97), 703 So.2d 1317.
[4] This court consolidated the Boatrights' and Priority's appeal in No. 96-1367 with their writ application in No. 96-2747, issuing the unpublished opinion in Priority E.M.S., Inc. v. Crescent City E.M.S., d/b/a Medic One and Medic One, Inc., unpub. 96-1367 (La.App. 4 Cir. 8/27/97), 698 So.2d 1078, writ denied 97-2279 (La.11/21/97), 703 So.2d 1317.
[5] Priority E.M.S., Inc. v. Crescent City E.M.S., Inc., d/b/a Medic One and Medic One, Inc., 98-2537 (La.App. 4 Cir. 12/23/98), 727 So.2d 1186.
[6] This assignment of error is listed as the fourth and fifth assignments of error in appellants' original brief and is also raised in their supplemental brief submitted after oral argument.
[7] Act 521 of the 1990 Regular Session of the Louisiana Legislature made substantial changes to the concept of civilian res judicata long recognized in Louisiana law. 1990 La. Act. 521, § 1. The revision introduced the "transaction or occurrence" model to arrive at the preclusive effect of the first action. La.R.S. 13:4231. This differs from the narrower civilian approach, which required identity of "cause," or grounds, in the two suits for a res judicata plea to obtain. See Mitchell v. Bertolla, 340 So.2d 287 (La.1976). 1990 La. Act. 521, § 5 specifically provided that "[t]his Act shall become effective January 1, 1991, and shall apply to all civil actions filed on or after January 1, 1991. The preclusive effect and authority of a judgment rendered in an action filed before the effect date of the Act shall be determined by the law in effect prior to January 1, 1991."
[8] Section 12(2) provides that:

Any person who ... offers or sells a security... by ... means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
15 U.S.C. § 77 l(2) (1982).
[9] Section 13 bars actions

unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created ... under section [12(2)] ... more than three years after the sale.
15 U.S.C. § 77 m (1982).
[10] Priority E.M.S., Inc. v. Crescent City E.M.S., d/b/a Medic One and Medic One, Inc., 97-2279 (La.11/21/97), 703 So.2d 1317.